Staples, J.
In these cases the ground has been taken, that the plaintiff’s bonds are contracts of hazard, and therefore not within the influence of the principles announced in the case of “Town of Danville v* Sutherlin,” supra. In support of this proposition the act of 14th October, 1863, passed by the Richmond Legislature, has been cited and relied on. That act provides that any contract made on or after the 20th October, 1863, for the payment of money, shall be deemed to be for the payment of the sum, expressed or implied, in the currency which, at the time the contract becomes payable, shall be receivable in payment to the State, unless this intendment shall be expressly - excluded. It is further provided, that the act shall continue in force until the expiration of six months after a treaty of peace between the Confederate States and the United States.
*609 It seems to me the meaning of this act is too plain ° . to admit of discussion. The Legislature, no doubt, thought that contracts thereafter made, as a general rule, would be based upon Confederate currency as a standard of value. The object was to provide a simple rule of evidence by which such contracts might be discharged in the same kind of currency. This view is confirmed by the provision limiting the operation of the act for six months after a treaty of peace, during which period it was supposed Confederate currency would constitute the sole circulating medium of the country. It is also confirmed by another act passed a short time before, at the same session, providing that Confederate notes should be thereafter receivable in payment of taxes and other public dues. Thus one act declares that Confederate currency shall be receivable in payment of all State dues; another closely succeeding declares, that all contracts, after a certain period, shall be presumed to be payable in such currency as the State may receive. The two construed together unmistakably indicate the legislative intent. It is clear that the act was intended as a measure of relief and protection to the debtor class. Such was the understanding when the act was passed, and such has been the construction given to it ever since.
Conceding, however, that these bonds are payable in such currency as the State may receive when they mature, is that such risk or hazard as relieves the contract from the taint of usury. It is well settled, that where, by the terms of the agreement, the repayment of the loan depends upon the happening of contingent events, or is to be made in a currency of fluctuating1 value, so that the lender may receive nothing, or something less than his principal and legal interest may amount to, the contract is not liable to the imputation of usury. Such loans are not within the statute, because the excessive premium is regarded as a compen *610 sation for the hazard, and not for the forbearance. Transactions of this character, in fact, are not loans, : but a species of wager. The lender, in making the contract, looks to the risk, and fixes his premium by his estimate of that risk. And the question arises in such cases, is this hazard encountered by the lender, a real, substantial hazard, or is it merely colorable ? If the latter, it will not take the case out of the operation of the statute, where the substance of the contract is a borrowing and lending. In the Earl of Chesterfield v. Jansseen, 1 Atk. R. 301, it is said the true distinction is between a colorable and a fair and absolute hazard of the principal money. If the lender has so made his agreement, he is secure from loss, and has a chance of gain. This, by taking away the contingency, deprives the transaction of its legality. Barnard v. Young, 17 Ves. R. 44; Steptoe’s Adm’rs v. Harvey’s Ex’ors, 7 Leigh 501.
In many cases the courts have held the contracts to be usurious, in consequence of the slightness of the risk, though the loans were upon their face contracts of hazard. Reynolds v. Clayton, 2 Anderson R. 15; Mason v. Abdy, 3 Salk. R. 390; Gibson v. Fristoe, 1 Call. 62. These are acknowledged principles of law. Ho¡w do they affect the contracts under consideration ? The only risk the plaintiffs incur of the loss of their ■claim, is that of the insolvency of the corporation. That, however, is a hazard every lender incurs in any case; but it does not enter into the definition of legal hazard, according to all the authorities.
The plaintiffs possibly run some' risk of receiving ■less than the amount advanced by them; but it must be admitted to be extremely slight. It is within the bounds of possibility, but altogether improbable. The plaintiffs loaned about ninety-two thousand dollars in Confederate notes, of the value of $4,000 in gold, stipulating for the repayment by the sum of *611 $37,000 in gold or legal currency, with interest thereon from the date of the contract. This interest amounts to $2,200 annually; and, by the time the bonds mature, the plaintiffs will have received, in the way of interest «lone, a sum nearly ten times the value of the loan, in-eluding principal and interest. And this enormous premium is to he paid before it can he ascertained in what sort of currency the principal is ultimately payable. The interest, for which these suits were instituted, is more than sufficient to repay the amount advanced by the plaintiffs.
Whatever may be the condition of the currency when the bonds mature, the plaintiffs have made themselves secure against loss by the reservation of interest, unless we are to assume that the State, at the expiration of thirty years, and in the meantime each successive year, will continue to receive a highly depreciated currency in payment of her dues. It is idle to say that the parties anticipated or apprehended any such result. If so, why was the enquiry made on the day of sale, whether the bonds were payable in Confederate currency? Why was the assurance given they would he paid in such currency as the State might receive when the day of payment arrived ? Why was it made known to the bidders that it was not the purpose of the corporate authorities to make any distinction between these bonds and other liabilities of the city contracted before the war ? Thére can he hut one answer to these enquiries. It was apprehended the bonds might he paid in the depreciated currency then in circulation. To remove this apprehension, to give confidence in these securities, the assurance was demanded and given that the common council were •determined to make no distinction between these obligations and any other liabilities of the city.
In all real contracts of hazard, the lender charges for the risk, and not for the loan. Here the supposed *612 risk is held out as an inducement to the lender to invest, and was actually supposed to enhance the value of the securities. Upon the face of the transaction, it is apparent that the usurious premium agreed to be paid was in consideration of the loan, and not of the-hazard incurred.
It is very clear, the city of Lynchburg would not have sold its bonds at such an enormous discount, but for the extremities to which it was reduced. Threatened with violence from without and violence within, it could only raise money by sacrifices which no people will ever submit to except from stern and imperious necessity. The condition of the country, the apprehension of riots, mob violence, and outrage upon the properly .and peace of the city, could alone have affected its credit to the extent disclosed by this transaction.. "We all know—universal observation attests—that as the difficulties and embarrassments of the borrower increase, the lender becomes more exacting in his terms, and will only part with his money at rates ruinous to pay. -
I do not mean to cast any reflection upon the plaintiffs. They, no doubt, honestly believed they were purchasing the bonds fairly in open market. And so every lender believes, in discounting the paper of the needy and distressed debtor, hawked about the market in search of a purchaser upon any terms. But his faith in the fairness of the transaction has nothing to do with the question of usury. Upon every reasonable calculation, these plaintiffs for the $4,000 in value -advanced by them will ultimately receive little less than $100,000 in a sound currency. If the statutes against usury do not reach cases like these, it is far better and wiser at once to repeal them, and leave to parties the right to make such contracts as their inclination or necessities may suggest.
It was argued that the city of Lynchburg disposed *613 of the Confederate notes upon most advantageous • terms. The answer is, it would have disposed of the larger sum, it ought to have received upon still more advantageous terms. It is well settled that the use the debtor may make of the money, or the profit he may derive from it, is not to be considered in ascertaining whether the transaction is usurious. In all such cases the true and only enquiry is, does the lender gain more than the legal rate. If so, the transaction is usurious, whatever may be the profit the borrower may realize. The rule is founded on good sense and sound principles of law, and is too well established to be now called in question.
Tor these reasons, I think these cases must be settled upon the principles laid down in the case of “ Town of Danville v. Sutherlin,” and the judgment reversed, as in that case.
Christian, J., concurred in the opinion of Staples, J.
Moncure, P., dissented.
Judgment reversed.